## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No.** |
| | : | |
| **ROSS I. MCLELLAN,** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **Defendant.** | : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against Defendant Ross I. McLellan ("McLellan").

## PRELIMINARY STATEMENT

1.      From approximately February 2010 to September 2011, McLellan and others at State Street Corporation ("State Street") schemed to defraud customers of State Street's Transition Management line of business by charging those customers hidden and unauthorized mark-ups (or amounts added to the cost of the service) on trading in U.S. and European securities.  The hidden mark-up scheme by McLellan and State Street Employees A and B (also referenced herein as the "State Street Co-Schemers,") encompassed transitions carried out for at least six State Street customers, who were collectively overcharged by approximately $20 million.

2.      At all times relevant to this Complaint, McLellan was employed at State Street in Boston, Massachusetts.  As an Executive Vice President and the Global Head of State Street's Portfolio Solutions Group, McLellan supervised all Transition Management

employees in both the United States and Europe, and was responsible for the global line of business at State Street.

3.      Transition Management is a service provided by financial institutions like State Street to large customers such as pension funds or endowments.  Transition Management services are utilized by such customers needing to buy and sell large quantities of securities – for example, when the customers may be changing fund managers or investment strategies. Often, Transition Management customers have complex investments consisting of relatively illiquid assets that due to their sheer size are difficult to sell without negatively affecting their price.  Through the use of Transition Management services, customers seek to efficiently move their investments, with the goal of reducing risk and cost.

4.      McLellan, along with the State Street Co-Schemers, developed and orchestrated a deliberate strategy to charge Transition Management customers hidden mark-ups on certain transactions.  Among other things, State Street employees, under the supervision of McLellan, misrepresented State Street's charges in connection with certain transition engagements.  These misrepresentations were made in a variety of communications to clients, including false trading statements, pre-trade estimates, and post-trade reporting.

5.      When McLellan and the State Street Co-Schemers were ultimately confronted by a customer that had detected some of the hidden mark-ups, McLellan aided and abetted others at State Street who made materially false and misleading statements to that customer to conceal the scheme to take hidden mark-ups.  Among other things, in or about August 2011, McLellan directed others at State Street to misleadingly characterize the hidden mark-ups as a "fat finger error" and as "inadvertent commissions."

6.      McLellan, along with the State Street Co-Schemers, initiated and participated

in the scheme to defraud Transition Management customers.  In addition to identifying customers to overcharge, McLellan oversaw the practice of taking hidden mark-ups, and directed others at State Street to engage in fraudulent acts and practices in furtherance of the scheme.

7.      By engaging in the misconduct directly, and by directing subordinates to mislead customers and/or conceal mark-ups as part of this scheme to defraud, McLellan and the State Street Co-Schemers generated approximately $20 million in additional revenue for State Street.

8.      By willfully, knowingly and/or recklessly engaging in the conduct described in this Complaint, McLellan violated Sections 17(a)(1) and (a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5] thereunder.  In addition, McLellan aided and abetted violations by others at State Street of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

## **JURISDICTION AND VENUE**

9.      The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §§78u(d)].

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, Sections 20(b) and (d) and 22(a) and (c) of the Securities Act [15 U.S.C. §§77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78(u)(e), and 78aa].

11.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2), Section 22(a) of

the Securities Act [15 U.S.C. §77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because the acts, practices, transactions and courses of business constituting the alleged securities law violations occurred in substantial part within this district and because the Defendant resides in this district.

12.     In connection with the conduct alleged in this complaint, McLellan directly or indirectly made use of the means or instrumentalities of transportation or communication in interstate commerce, or of the mails.

13.     McLellan's conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## **DEFENDANT**

14.     **Ross I. McLellan ("McLellan"),** age 44, is a resident of Hingham, Massachusetts.  During the relevant period, he was Senior Managing Director and Global Head of State Street's Portfolio Solutions Group, the largest component of which was Transition Management.  McLellan supervised Transition Management employees in both the United States and Europe, including but not limited to another high-level State Street employee who worked in the United Kingdom ("State Street Employee A"), and another State Street employee in the United Kingdom ("State Street Employee B"), who reported directly to Employee A.  McLellan was also President and Member of the Executive Management Group for broker-dealer State Street Global Markets, LLC, a State Street subsidiary.  McLellan was registered with the broker-dealer when affiliated with State Street Global Markets LLC from November 1997 to November 2011.

## OTHER RELEVANT PARTIES

15.     **State Street Employee A** is a resident of the Netherlands.  At all times relevant to this Complaint, State Street Employee A was Senior Managing Director EMEA (Europe, Middle East and Africa) and Head of State Street Portfolio Solutions Group. State Street Employee A's primary role at State Street was to obtain new Transition Management customers and to maintain relationships with existing customers.

16.     **State Street Employee B** is a resident of the United Kingdom.  At all times relevant to this Complaint, State Street Employee B was Head of EMEA Transition Management Desk for State Street Portfolio Solutions Group, reporting to State Street Employee A.  State Street Employee B's primary responsibilities at State Street included supervising a team of analysts, and providing daily updates and post-trade reports to customers of State Street's Transition Management business.

17.     **State Street Corporation** is a financial holding company organized under Massachusetts state law and headquartered in Boston, Massachusetts.  Its common stock is listed on the New York Stock Exchange under the symbol "STT" and its securities are registered with the Commission pursuant to Section 12(g) of the Exchange Act.  State Street Corporation files periodic and current reports with the Commission.

18.     **State Street Bank and Trust** is the principal banking subsidiary of State Street Corporation.  State Street Bank and Trust is registered with the Federal Reserve as a bank holding company.

19.     **State Street Global Markets LLC ("State Street Global Markets")** is a broker-dealer registered with the Commission under the Exchange Act and is a wholly-owned subsidiary of State Street.  State Street Global Markets is headquartered in Boston,

Massachusetts and has been registered as a broker-dealer with the Commission since 1992. State Street Global Markets provides trade execution services for Transition Management customers with holdings of US equity and fixed income securities, and therefore generates revenues from these customers.

20.     **Portfolio Solutions Group ("Portfolio Solutions")** is a business unit of State Street, which provides trading, Transition Management and other services to State Street customers.

## FACTUAL ALLEGATIONS

**A.      State Street's Transition Management Business**

21.      Transition Management is a service provided by financial institutions to clients that are undergoing a "transition."  Typically, Transition Management services are marketed to customers, such as pension funds or investment managers, which are changing fund managers or investment strategies and face large and complex changes to their portfolios of assets.  Transition Management services are marketed as a means to help reduce the cost of such "transitions," which often require the execution of a large quantity of orders to buy and sell stocks (thus generating significant expenses for the customer.)

22.      From approximately February 2010 to September 2011, State Street offered Transition Management services to customers (both in the United States and elsewhere) that needed large portfolios of securities to be restructured, and to customers removing or replacing asset managers.  While the Transition Management customers' holdings were comprised of different types of investments, virtually all customers required services that included the buying or selling of securities that traded in the United States, including equities (such as stock) and fixed income instruments (such as corporate or government bonds).

23.      There is a wide range of business arrangements by which various sellers of Transition Management services generate revenue and charge fees.  Among other methods, the transition manager may charge commissions on trades of equities and/or mark-ups on fixed income instruments.  Certain Transition Management providers may trade as a "principal" with their customers and earn revenue by charging a spread, i.e., taking the difference between the "bid" and "ask" amounts on the trades as profit.  Other managers may offer services at a fixed price, as a project fee.

24.      At all times relevant to this Complaint, State Street routinely marketed itself to

customers as offering a unique Transition Management model, in which State Street would play an un-conflicted, fiduciary role.  Unlike many banks offering more traditional Transition Management services, State Street marketed itself as free from the conflicts of interest that are associated with executing transitions for its customers while also running a proprietary trading book, i.e., trading the firm's money for the firm's own benefit.

25.     Among other things, State Street touted that it was a founding signatory to the T-Charter, a voluntary, best-practices code for transition managers. The T-Charter, entered into by State Street in or about 2007, sets forth a number of principles relating to disclosure and remuneration, and in particular states that the transition manager will not apply commissions or charges, adjust prices or apply mark-ups other than as agreed with the client in the contracting documentation and as disclosed in a disclosure document.  McLellan and others, including the State Street Co-Schemers, explicitly held State Street out to various Transition Management customers as adhering to the principles contained in the T-Charter.

26.     To earn revenue from Transition Management customers, State Street typically charged a commission when trading in equities and took a disclosed mark-up on trading in fixed income instruments.  In certain instances, and depending on the contractual terms, State Street charged a fixed management fee, rather than a commission.  State Street also generated revenue from foreign exchange and futures transactions it carried out as part of a transition.

27.     Transition Management customers were typically informed of State Street's compensation and the charges for services by key contractual documentation provided by employees of State Street, including the State Street Co-Schemers:   the Transition Management Agreement ("TMA") (the governing agreement for each Transition Management customer); and/or the Periodic or Transition Notice (an Appendix that provided

specific details of individual transitions for particular customers).  However, foreign exchange (or "FX") revenue was not generally specified in the TMA.

28.     The fees and commissions charged were material to State Street's Transition Management customers, since the reason that customers seek transition management services in the first place is to keep the cost of the transition as low as possible, as well as to reduce risk.  Indeed, State Street typically won transition management business through a Request for Proposal process, in which the lowest bidder often prevailed, and in which the size of fees and commissions charged by the transition manager was highly material to the prospective customer.

**B.      State Street's Overcharging Scheme, Led by McLellan and Others**

29.     In 2010, State Street began to experience a shortage of major Transition Management deals, which impacted the financial performance of the Portfolio Solutions business.

30.     From approximately February 2010 to September 2011, McLellan, along with State Street Employees A and B, schemed to charge hidden mark-ups to Transition Management customers to generate additional revenue.

31.     Specifically, in connection with certain transition engagements during the period from February 2010 through September 2011, McLellan and the State Street Co-Schemers engaged in a pattern of fraudulent acts and practices in order to extract additional revenues from concealed mark-ups.  In addition to instructing his subordinates generally to execute the hidden mark-up scheme, in multiple instances McLellan gave specific instructions aimed at keeping mark-ups hidden, including what prices to charge and what levels at which to execute trades.

32.     Typically, McLellan and the State Street Co-Schemers selected fixed income trades as the vehicle for hiding mark-ups as part of this scheme.  State Street typically did not disclose pricing on fixed income trading to customers, and was rarely asked for a breakout of pricing.  By selecting fixed income trades executed during the transition on which to take the mark-ups, McLellan and the State Street Co-Schemers sought to conceal the mark-ups from transition customers.

33.     McLellan and the State Street Co-Schemers deliberately selected certain types of transitions on which to perpetrate the scheme to take hidden mark-ups.  Among other things, McLellan and the State Street Co-Schemers selected transitions that were larger than others, because it was easier to hide the mark-ups amidst the large dollar amounts, and because these transitions were large enough that the mark-ups – even if small on a percentage basis – could generate substantial profits for State Street.

34.     In 2010, State Street was awarded two fixed income transitions for a government body responsible for management and administration of assets of a country located in the Middle East Region[1] (the "Middle Eastern Sovereign Wealth Fund").  The two transitions for the Middle Eastern Sovereign Wealth Fund had a combined value of approximately $6 billion.  It was on these transitions that McLellan and the State Street Co-Schemers created and deployed the hidden mark-up scheme for the first time, beginning in early 2010.

### The First Middle Eastern Sovereign Wealth Fund Transition

35.     In or about March 2010, the Middle Eastern Sovereign Wealth Fund selected State Street to manage the first of two transitions.  This transition involved the termination of

---

[1] The Commission is using generic descriptions of the Transition Management customers who were defrauded by McLellan and others at State Street, rather than including their names in the Complaint.

a fixed income portfolio of US Treasury bills and required State Street to trade in European, US and Canadian securities.

36.     Prior to awarding State Street the first transition, there were lengthy negotiations between State Street and the Middle Eastern Sovereign Wealth Fund, during which State Street (specifically, State Street Employee A) agreed to undertake the transition on a zero commission (and no fee) basis.

37.     During the negotiations, in February 2010, State Street Employee A advised the Middle Eastern Sovereign Wealth Fund via email that State Street preferred to charge a disclosed commission, but in this instance it had arranged to receive compensation "from the 'other side' (the successful/winning counterparty for each individual security as chosen by us as your agent in a competitive bid process) … which will enable us to keep commissions for [the Middle Eastern Sovereign Wealth Fund] at zero."   State Street Employee A then forwarded the email to McLellan.

38.     This representation by State Street Employee A was false and misleading. State Street's charges would come, not from the "*other side,*" but from the Middle Eastern Sovereign Wealth Fund itself.

39.     Further, State Street Employee A represented to the Middle Eastern Sovereign Wealth Fund that this would amount to "only a few" basis points[2] of commission and that the Middle Eastern Sovereign Wealth Fund would "get the best execution in the market."

40.     The Middle Eastern Sovereign Wealth Fund asked State Street to confirm that "[i]n terms of quoting zero commission" State Street was in compliance with the T-Charter. In response, State Street Employee A made reference to a draft of the Periodic Notice, which

---

[2] A "basis point" is a unit of measurement used in finance to describe one hundredth of a percentage point.  Many financial institutions like State Street calculate commissions and fees using basis points as the units of measurement.

disclosed that the source of revenue would be mark-ups included in the spread.

41.     These representations by State Street Employee A to the Middle Eastern Sovereign Wealth Fund were misleading.   While it was made clear to the Middle Eastern Sovereign Wealth Fund that State Street would be paid for the transition, it was not true that State Street would receive compensation from the counterparty.   In addition, the source and calculation of revenue was not properly disclosed.   Neither the Periodic Notice sent to the Middle Eastern Sovereign Wealth Fund nor the executed version disclosed that the source of revenue would be mark-ups included in the spread, as required for a firm complying with the T-Charter.   Nor did State Street disclose how commissions were calculated and collected, which was also a requirement of the T-Charter.

42.     When State Street was awarded the first transition for the Middle Eastern Sovereign Wealth Fund, State Street Employee A alerted McLellan and State Street Employee B, noting: "… [I]f they are bonds then we should make our quarter."   State Street Employee A's email was revealing; while the transition for the Middle Eastern Sovereign Wealth Fund was purportedly done by State Street for no fee, State Street Employee A clearly expressed that this transition would generate sufficient income from trading bonds to "make" the quarterly target for earnings by the Transition Management group and/or the Portfolio Solutions team.   In other words, State Street Employee A was acknowledging that commissions would be charged on fixed income trading in order to boost revenue to meet expectations for a particular quarter.

43.     On or about June 3, 2010, State Street Employee A advised State Street Employee B over the telephone that he had just spoken with McLellan about the first Middle Eastern Sovereign Wealth Fund transition, and passed along McLellan's suggestion that they

should take 1 or 2 basis points "on the outgoing side."  Noting that McLellan's proposed hidden charges would be easy to conceal, State Street Employee A commented: "[N]o one is going to [expletive] notice that … It's a rounding error[.]"  State Street Employee A also assured State Street Employee B that he had arranged for McLellan to be "on top of" the trading desk in the US to make sure they facilitated the scheme to take undisclosed mark-ups on trades.  State Street Employee A emphasized this point again in an e-mail to McLellan, telling him:  "Gonna have to be creative and need you involved on the [fixed income] trading desk in [the] US to ensure they do as we want."

44.     Although McLellan was a high-ranking State Street employee who normally did not directly supervise the traders responsible for executing a transition, he was closely involved in pricing on certain US fixed income trades as part of the first Middle Eastern Sovereign Wealth Fund transition.  For example, between June 15, 2010 and June 18, 2010, McLellan communicated the client-side prices for certain US-issued bond trades to State Street Employee B, and then ensured that those prices were transmitted to the trading desk in Boston by State Street Employee B.

45.     Upon completion of the first transition, the post-trade analysis report provided to the Middle Eastern Sovereign Wealth Fund omitted any reference to the mark-ups that State Street had applied to the Middle Eastern Sovereign Wealth Fund's trades, which amounted to $2.7 million, equivalent to 9 basis points.  Accordingly, State Street's claims that it was in compliance with the T-Charter were misleading to the Middle Eastern Sovereign Wealth Fund.

### *The Second Middle Eastern Sovereign Wealth Fund Transition*

46.     In or about May of 2010, State Street learned that the Middle Eastern Sovereign Wealth Fund would be accepting bids for a second transition, which involved the restructuring of a US Treasury bill portfolio valued at $4 billion and was fixed income only, made up of European, US and Canadian trades.  While McLellan was not directly involved in the bidding process for the second transition, State Street Employee A kept McLellan apprised Employee A of the negotiations, and McLellan guided State Street Employee A as to how to structure the bid.

47.     For example, in May of 2010, State Street Employee A, in preparing the pitch for the second Middle Eastern Sovereign Wealth Fund transition, told McLellan that a competitor was bidding to perform the transition for a fee of 2 basis points.  State Street Employee A then stated to McLellan:  "We need to find a way to charge a spread."  McLellan directed State Street Employee A to bid 1.75 basis points as a flat fee and told State Street Employee A:  "We will make it work."

48.     As the e-mails exchanged by McLellan and State Street Employee A the following day made clear, McLellan intended to "make it work" by charging hidden mark-ups.  In an e-mail exchange on May 13, 2010, McLellan and State Street Employee A debated the wording of the standard Transition Management Agreement at State Street, and then agreed to charge a management fee and zero commission, "acting as riskless principal."

49.     Prior to bidding for the second Middle Eastern Sovereign Wealth Fund transition, on August 29, 2010, State Street Employee A suggested to McLellan in an e-mail that State Street should "bid zero again" and McLellan replied: "Agree 100 percent."

50.     The draft Periodic Notice provided by State Street to the Middle Eastern

Sovereign Wealth Fund stated as follows: "Trades will not attract any commission and will be priced net. The manager may benefit from a bid-ask spread." However, the signed version returned by the Middle Eastern Sovereign Wealth Fund did not contain this language.

51. Once State Street was awarded the second fixed income transition for the Middle Eastern Sovereign Wealth Fund, on October 21, 2010, State Street Employee A and State Street Employee B exchanged emails commenting: "Nice!" and "Back up the truck!"

52. On or about October 21, 2010, State Street Employee A e-mailed another State Street employee to announce that they had won the second Middle Eastern Sovereign Wealth Fund transition. When the employee asked about projected revenues, State Street Employee A responded: "Back up the truck. 6 or 7 or 8. Whatever you want." Shortly before the transition commenced, McLellan and State Street Employee A exchanged further emails about concealing the documents governing the transition from State Street's legal department:

> McLellan: Did they [e.g., the legal department] look at the original agreement?

> State Street Employee A: "Absolutely not. Nor did they look at the periodic notice. This can of worms stays closed!"

> "[By the way]- there is no way we can disclose our spread."

> McLellan: "Agreed."

53. Shortly after the second transition for the Middle Eastern Sovereign Wealth Fund was awarded to State Street, McLellan again directed the trading strategies and suggested charging an 18 basis point markup on one trade in particular.

54. In order to disguise the mark-ups which State Street expected to charge the Middle Eastern Sovereign Wealth Fund, the pre-trade estimate analysis report added a fictitious figure, which was labeled a "market impact" estimate. This so-called "market

impact" estimate of $5 million was moved from the estimate of the bid-ask spread by State Street's Transition Management employees on instructions from Portfolio Solutions senior management.  This presentation of the trading costs concealed the amount of the mark-up which State Street expected to charge the Middle Eastern Sovereign Wealth Fund.

55.    State Street's earnings for the second transition were included in the market impact and bid-ask spread costs, instead of being separately listed, thus obscuring the amount charged by State Street on this transition from the Middle Eastern Sovereign Wealth Fund. The total costs listed in the post-trade analysis report include $4.7 million for market impact, which was misleading, since that number incorporated the earnings made by State Street from the hidden mark-ups which State Street had applied to the Middle Eastern Sovereign Wealth Fund's trades.

56.    In total, State Street charged approximately $9.7 million in hidden mark-ups for the two Middle Eastern Sovereign Wealth Fund transitions.

### December 2010:  McLellan and Others Effect the Scheme to Defraud on an Irish Government Agency

57.    On or about December 10, 2010, State Street was awarded a transition for a government agency that managed the assets and liabilities of the government of the Republic of Ireland, including the national debt and pension reserves (the "Irish Government Agency").  The transition involved both fixed income and equities trading (including US trading).  The transition was valued at approximately 4.7 billion Euros, and was effected by State Street in three separate stages (or "tranches").

58.    As part of the scheme to defraud State Street's customers, McLellan and the State Street Co-Schemers charged the Irish Government Agency hidden mark-ups for the equity and fixed income trades that were conducted as part of the transition.

59.     In November of 2010, McLellan and the State Street Co-Schemers began discussing the bid for the Irish Government Agency transition.  During those discussions, State Street Employee A e-mailed McLellan to stress the importance of winning the transition, exclaiming:  "Gotta win this one!  Any ideas how to get more revenue would be appreciated."  State Street Employee A then suggested to McLellan that State Street propose a 1 basis point management fee with "no commissions, and then take a spread[.]"

60.     McLellan supervised State Street Employee A, and advised him about how to structure the bid to win the Irish Government Agency transition.  Specifically, McLellan told State Street Employee A:  "Agree with a zero commission bid."  State Street Employee A replied:  "Great minds think alike.  We have to charge [a] fee … otherwise they get suspicious[.]"  State Street Employee A later e-mailed State Street Employee B:  "Fees: 1.25 [basis points].  No commissions.  Just to clarify – 1.25 bps is the management fee.  The extra quarter point makes it look like we actually thought about it and did the calculations."

61.     The Irish Government Agency eventually agreed to pay a fixed management fee of 1.65 basis points, as set out in the Transition Notice, and subsequently, State Street reduced that fixed fee to 1.25 basis points for the third tranche.  Meanwhile, McLellan and the State Street Co-Schemers continued to hone their scheme to extract hidden fees from the Irish Government Agency transition.  Through e-mail communications in late December 2010, State Street Employee A and McLellan worked out the specifics of their plan to charge hidden trading fees to the Irish Government Agency:

> State Street Employee A:  "need to be very creative here"
>
> McLellan:  "we will."
> . . .
> State Street Employee A:  "Here's what I think we should do with our new best friends[…]: - 1.65bps for the privilege of working with us […]

- 10-12 bps out of FI [fixed income]– 3bps spread out of US equity and global small cap – trade all global em (*sic*) mkt net through brokers – organise with FX [foreign exchange] to collect 5bps for trading back to euro. Perhaps the FX bit needs a discussion upfront involving you and [an individual from SSGM Sales Trading Research], but we HAVE to show revenue in our numbers".

McLellan:  ". . . Fx won't be a problem."

62.     In addition to the disclosed management fee, McLellan and the State Street Co-Schemers charged the Irish Government Agency hidden commissions on the equity trades on both the first and third tranches, and charged hidden mark-ups on the fixed income trades across all three tranches.

63.     In order to conceal the hidden commissions added to the Irish Government Agency's equity trades, and in furtherance of this scheme, McLellan and the State Street Co-Schemers directed that the relevant trades be booked through a trading account that State Street normally used for non-Transition Management business to provide an average price to customers for a day's trading.   At the direction of McLellan and the State Street Co-Schemers, employees extracted trade data from the trading records, added commissions, and then uploaded the adjusted equity prices into the trading records.   Through this back-door method of booking the trades, McLellan and the State Street Co-Schemers intentionally hid the commissions they had added to the equity trades executed on behalf of the Irish Government Agency.

64.     Contrary to their representations, which were set forth in the State Street agreement with the Irish Government Agency, McLellan and the State Street Co-Schemers also directed the trading desks to apply mark-ups to fixed income trades.   These instructions directly contradicted written instructions to traders not to charge commissions for fixed income on transitions.

65.     When the application of mark-ups on fixed income trades was questioned by a State Street employee in Boston, he was informed by State Street Employee A via e-mail on February 24, 2011: "[I]ts on a need to know basis… speak with Ross [McLellan], who knows the strategy here."   State Street Employee A's e-mail was then forwarded to McLellan by a managing director, who asked McLellan:  "Care to share?  I want to make sure I tell Finance the right amount to accrue, [as it] looks like we are recognizing revenues on the fixed income and futures."

66.     Throughout all three tranches of the transition for the Irish Government Agency, McLellan monitored and guided the scheme to take hidden mark-ups.  On March 16, 2011, McLellan received documents for the second tranche of the transition, which stated that "zero comm[ission]s" were taken.   McLellan forwarded the documents to State Street Employee A via email, and asked if State Street Employee A was "giving [expletive] away?"  State Street Employee A responded:  "Have I ever let you down on [fixed income?]"

67.     Under the terms of its contract with the Irish Government Agency, State Street earned a contractual fee for the transition totaling approximately $1,634,085.   In addition, through the fraudulent acts and practices of McLellan and the State Street Co-Schemers, State Street took additional revenue of approximately $3.7 million from the hidden mark-ups and commissions.

### February 2011:  McLellan and His Co-Schemers Defraud a British Postal Company

68.     In early February 2011, State Street learned of an opportunity to bid on a £1.3 billion (British Pounds) transition for a postal service company that provides mail collection and delivery services throughout the United Kingdom (the "British Postal Company").   The transition was fixed income only, and comprised of both European and US trades.   On

February 3, 2011, State Street Employee A e-mailed McLellan, noting that the potential bid was "[c]onfidential but… gotta win that one!"   In response, McLellan told State Street Employee A:   "Thin to win."   This reflected McLellan's and his co-schemers' strategy of winning bids by proposing very low ("thin") fees and then making the deals profitable by adding hidden commissions after they won the business.

69.     In February 2011, the British Postal Company awarded the transition to State Street.  State Street's Transition Notice advised the British Postal Company that a fixed fee of 1.75 basis points "on the value of the portfolio" would be charged.  State Street's total agreed fee was $922,107.

70.     The British Postal Company specifically sought confirmation that the fixed fee was the "full and final transition fee including all buying and selling required."  State Street Employee A confirmed in writing that "the fee includes all trading required."  To enhance the impression that the deal was unfavorable for State Street he added,   "Don't make me go this low every time though!"

71.     State Street Employee A's e-mail to the British Postal Company was false and misleading.   In fact, McLellan and the State Street Co-Schemers intended to charge the British Postal Company hidden mark-ups on the transition.  On February 21, 2011, McLellan praised State Street Employee A for winning the bid with the British Postal Company, saying "Nice work."   State Street Employee A immediately replied to McLellan by saying: "I am thinking 1.5-2bpy [basis points]".

72.     McLellan gave explicit instructions to the trading desk in Boston to ensure that – as Employee A proposed – commissions were charged on the British Postal Company transition trades, contrary to the express representations to the customer that there would be

no such charges.  This meant that McLellan had to override the internal written instructions that had been supplied to the State Street trading desk, based on the agreement with the British Postal Company.  In one such call, McLellan told the trader: "On the [transition…] that came in yesterday, you can actually take a basis point of yield on those."  As the conversation continued, McLellan directed the trader to disregard prior trading instructions from others at State Street not to charge any commissions:

> Trader:  Okay.  One [basis point]?  Got it.
>
> McLellan:  All right.  I will catch up later.
>
> Trader:  I was just actually on a chat with [another State Street employee].  She was just telling me, don't charge any commissions, so I was just going to – I am going to take your word and just go with it.
>
> McLellan:  Yes, I just talked to [State Street Employee A].
>
> Trader:  Awesome.  All right, I will do one [basis point].
>
> McLellan:  Thanks, bye.  Thanks pal.

73.   Beyond directing the trading desk to apply hidden mark-ups to US trades, McLellan also instructed State Street employees to conceal the commissions on documentation sent to the British Postal Company.  In February 2011, McLellan spoke to the same trader in Boston, asking whether he was "backing out" the British Postal Company (meaning, deleting commissions from documentation).  The trader confirmed that he was "doing it right now" as McLellan inquired about "corporate spreads" and confirmed that the transition was "hedged with futures."  McLellan then instructed the trader: "All right.  Stay with the BPS basis point of yield, then."  The trader assured McLellan that he would delete any reference to commissions charged in the file for the British Postal Company transition – a file that would go first to State Street compliance, and then to the transition customer: "Yes,

definitely.  And I am zeroing out those commissions when I send over the file."

74.     Similar to the instructions sent to State Street's trading desk in the United States, the trading instructions sent to State Street's UK trading desk for the British Postal Company transition stated *"Comms: ZERO COMMS"* (which meant that no mark-up should be applied to the trades).  This was consistent with the contractual documentation for the British Postal Company transition.  In practice, however, an average mark-up of 1 basis point was applied to US trades, and an average mark-up of 2 basis points was applied to European trades.

75.     As with the Middle Eastern Sovereign Wealth Fund, McLellan and his co-schemers concealed the mark-ups in the transition reports sent to the British Postal Company.  Among other things, the initial pre-trade analysis report included an undisclosed mark-up of 1.75 basis points in the "bid-ask" spread line of the initial pre-trade analysis report.  This was reduced to 0.75 basis points in the final pre-trade analysis report sent to the British Postal Company.

76.     The transition results reported to the British Postal Company were almost identical to the estimate in the pre-trade analysis report, but again, hidden within the "bid-ask" spread line was more than $3 million of revenue taken by State Street as a result of the hidden mark-ups which had been applied.

### *Additional Misconduct by McLellan and Others at State Street*

77.     In addition to the transitions for the Middle Eastern Sovereign Wealth Fund, the Irish Government Agency and the British Postal Company, McLellan and the State Street Co-Schemers engaged in fraudulent acts and practices in several other large-scale transitions at State Street between February 2010 and September 2011, including (but not limited to) a

transition for a UK-based pension fund for an £850 million (British Pounds) bond portfolio, a €1.6 billion (Euros) transition in the Netherlands that required the restructuring of the Euro-denominated fixed income portfolios of two pension funds, and a €1 billion (Euros) global equities and fixed income transition for a telecommunications agency in the Republic of Ireland.

78.     State Street earned additional revenue of at least $3 million from the hidden mark-ups on other transactions for the above-described Transition Management customers.

**C.     Discovery and Cover-up of the Overcharging Scheme**

79.     On June 21, 2011, the British Postal Company contacted State Street Employee 1, asking if the fee of 1.75 basis points (plus commissions for futures execution) was "the sole revenue for [State Street] and/or any of its affiliates on this event."

80.     State Street Employee A falsely confirmed that the British Postal Company's understanding was correct, despite knowing that undisclosed mark-ups had been taken on the fixed income trades.  The British Postal Company responded by noting that their own consultant, using publicly available bond pricing information in the US, had identified mark-ups on certain US fixed income trades which had not been disclosed.

81.     State Street Employee A initially sought to stave off further inquiry from the British Postal Company, replying by e-mail that it *"doesn't seem right,"* despite his knowledge that hidden mark-ups had been deliberately applied to the trades.  However, the British Postal Company persisted in raising their concerns about the hidden mark-ups on transition trades by State Street.

82.     In or about June 2011, McLellan, State Street Employee A, and State Street Employee B participated in a meeting, during which McLellan explicitly

23

proposed lying to the British Postal Company – to wit, that State Street's undisclosed mark-ups were the result of a "fat finger mistake" (essentially a clerical or typing error) and that they only occurred on US-based trades.  As McLellan, State Street Employee A, and State Street Employee B well knew, they had intentionally taken hidden mark-ups on this transition, and those hidden mark-ups were not the result of any "fat finger mistake" or any kind of inadvertence.  Nonetheless, the co-schemers agreed with McLellan that they should make the following misrepresentation to The British Postal Company:

> *"our trading desk in the US has erroneously applied commissions of 1 bp of yield to trades that should have gone through at zero commission."*

State Street Employee A also sent an e-mail to the British Postal Company, stating that the markup taken on US trades was a "fat finger error."  As State Street Employee A (and McLellan) knew, both of these statements were misrepresentations, since the mark-ups were taken intentionally.

83.     McLellan, by directing the State Street Co-Schemers to lie to the British Postal Company, aided and abetted material misrepresentations by the State Street Co-Schemers.

84.     McLellan proposed that a third party calculate the shortfall and refund owed to the British Postal Company as a result of the undisclosed mark-ups on US-based fixed income trades.  At the direction of McLellan and others, State Street agreed to rebate the British Postal Company approximately $1 million for the mark-ups that had been applied to the US trades, again describing them in words suggested by McLellan:

> *"inadvertent commissions."*

85.     In order to avoid drawing attention from State Street's compliance or legal

personnel, McLellan and others at State Street circumvented the usual processes and procedures to reimburse the British Postal Company without recording the repayment in State Street's loss event tracking system.

86.     While arranging to reimburse the British Postal Company, McLellan continued to conceal not only the fact that mark-ups on US trades were taken intentionally but that State Street deliberately took hidden mark-ups on the British Postal Company's European trades, resulting in additional revenue of approximately $2 million.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Antifraud Provisions of the
Securities Act**

**[Violation of Section 17(a)
of the Securities Act]**

1.      The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 86 above.

2.      By engaging in the conduct described above, Defendant Ross McLellan has, directly or indirectly and singly or in concert, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities, employed devices, schemes, or artifices to defraud, and/or engaged in transactions, acts, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities.

3.      By engaging in the conduct described above, McLellan has directly or indirectly and singly or in concert, violated, and unless enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)].

### Second Claim for Relief

**Antifraud Provisions of
the Exchange Act**

**[Violation of Section 10(b)
of Exchange Act and Rule
10b-5 By McLellan]**

4.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 86 above.

5.     By engaging in the conduct described above, Defendant Ross McLellan has, directly or indirectly and singly or in concert, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mail, employed devices, schemes, or artifices to defraud, and/or engaged in transactions, acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

6.     By engaging in the conduct described above, McLellan violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5].

**Third Claim for Relief**

**Antifraud Provisions of
the Exchange Act**

**[Aiding and Abetting
Violation of Section 10(b)
of Exchange Act and Rule
10b-5 By McLellan]**

7.      The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 86 above.

8.      By engaging in the conduct described above, Defendant Ross McLellan has, directly or indirectly and singly or in concert, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mail, made untrue statements of material fact or omitted to state material fact(s) necessary to make statements made not misleading in light of the circumstances under which they were made.

9.      McLellan knowingly or recklessly provided substantial assistance to others at State Street's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

10.      By engaging in the conduct described above, McLellan aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court:

A.      Find that McLellan committed the violations alleged in this Complaint;

B.      Enter a permanent injunction restraining and enjoining McLellan and each of his agents, servants, employees and attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from future violations of, and aiding and abetting future violations of, Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

C.      Order McLellan to disgorge the ill-gotten gains he received as a result of his violation of the federal securities laws, plus pre-judgment interest thereon;

D.      Order McLellan to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

E.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.      Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.


Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its attorneys,

/s/ Rua M. Kelly
Eric Heining (Mass. Bar No. 664900)
Rua M. Kelly (Mass. Bar No. 643351)
Benjamin Mack (Mass. Bar No. 661590)
33 Arch Street, 24th Floor
Boston, MA  02110
(617)-573-8941 (Kelly direct)
(617)-573-4590 (facsimile)
Email:  kellyru@sec.gov

Dated:  May 13, 2016